# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| GREGORY TUTTLE, *on behalf of himself and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>NEWREZ, LLC d/b/a SHELLPOINT MORTGAGE SERVICING, and TERWIN MORTGAGE TRUST 2005-3SL, by U.S. Bank National Association as Trustee,<br><br>Defendants. | Civil Action No. _____ |

## CLASS ACTION COMPLAINT

Plaintiff Gregory Tuttle ("Plaintiff"), individually and on behalf of all others similarly situated, through counsel, files this Class Action Complaint against Newrez, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") and Terwin Mortgage Trust 2005-3SL (the "Trust") (collectively, "Defendants"), and alleges as follows:

## BACKGROUND

1.      This case concerns the decision by Shellpoint and its predecessor in interest, Specialized Loan Servicing, LLC ("SLS"), to inflate borrowers' balances on long-dormant second mortgages through unfair, deceptive, and unconscionable means.

2.      In the lead up to the Great Recession, mortgage lenders targeted prospective homebuyers by offering loans that required no downpayment. These lending arrangements

typically involved two loans: a primary mortgage that covered approximately 80 percent of the home's appraised value; and a second "piggyback" mortgage that operated as a functional downpayment to cover the remaining sales price. By design, the second mortgage overextended borrowers, resulting in the mass foreclosures that caused the Great Recession.[1]

3.    Plaintiff built and moved into his home in Yadkin County in 1999. In January 2005, he refinanced his home using an 80/20 mortgage arrangement.

4.    Shortly after refinancing his home, in March 2005, SLS acquired the servicing rights to Plaintiff's second mortgage. SLS later merged with Shellpoint following an acquisition by Shellpoint's parent company in 2024.[2]

5.    However, under its standard policies and procedures, Shellpoint's predecessor SLS stopped sending Plaintiff monthly statements on his second mortgage in or around August 2006, the month before Plaintiff filed for Chapter 7 bankrtupcy. The second mortgage was discharged and charged off following Plaintiff's bankruptcy.

6.    At the time of Plaintiff's bankruptcy, the Truth in Lending Act ("TILA") and its enacting regulation, "Regulation Z," did not require servicers to send statements to

---

[1] The Consumer Financial Protection Bureau describes "80/20" loans as a type of "piggyback mortgage product" that "involved a first lien loan for 80% of the value of the home and a second lien loan for the remaining 20% of the home's valuation." *See* CONSUMER FIN. PROT. BUREAU, *CFPB Issues Guidance to Protect Homeowners from Illegal Collection Tactics on Zombie Mortgages*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-guidance-to-protect-homeowners-from-illegal-collection-tactics-on-zombie-mortgages (last visited Feb. 1, 2024).

[2] *Rithm Capital to Acquire Specialized Loan Servicing LLC*, Businesswire (Oct. 2, 2023), https://www.businesswire.com/news/home/20231001340340/en/Rithm-Capital-to-Acquire-Specialized-Loan-Servicing-LLC.

mortgages discharged through bankruptcy. But in April 2018, the Consumer Financial Protection Bureau ("CFPB") changed Regulation Z to require that statements be sent even to those whose debt was discharged so long as the debtor still retained an interest in the underlying property that was subject to foreclosure, as Plaintiff did here. SLS even acknowledged this change in correspondence sent to Plaintiff at the time of the regulation changes.

7.     Despite SLS's knowledge of the new regulations, SLS did not start sending monthly statements to borrowers whose loans had been discharged in bankruptcy, including Plaintiff.

8.     Statements, of course, would have periodically apprised Plaintiff of the balance of his loan, including interest that was supposedly still accruing after discharge and charge-off of the loan in 2007. Statements were especially critical because Plaintiff was at risk of losing his home through foreclosure.

9.     As a result, Plaintiff heard nothing about his second mortgage for more than a decade, including at least a year after the TILA regulations changed in 2018 and SLS sent him a letter stating that it would resume sending monthly statements.

10.     Then, out of the blue, Plaintiff started receiving statements from SLS stating that he now owed tens of thousands in retroactive interest for the period in which he had not received the required monthly statements.

11.     Making matters worse, in 2023, the Trust filed an action to foreclose on Mr. Tuttle's home seeking to collect the retroactive interest and fees for periods in which the Trust and the servicer of his loan (SLS) had not sent him monthly statements. *See In re*

3

*The Foreclosure of a Deed of Trust Executed by Gregory Wayne Tuttle*, No. 23SP153 (NC. Gen. Ct. Yadkin).

12.    Plaintiff disputed the amounts Defendants claimed he owed through complaints with the North Carolina Office of the Commission of Banks, the State Attorney General, the Federal Trade Commission, and the CFPB, which were forwarded to SLS. Plaintiff also sent a Qualified Written Request to SLS under the Real Estate Settlement Procedures Act ("RESPA") in October 2023.

13.    In response to these complaints and the QWR, SLS acknowledged that it was required by federal regulations to send monthly statements to Mr. Tuttle, but it claimed, contrary to its own records, that it had sent all required monthly statements.  It also claimed that it had charged off the loan in 2009, which under Regulation Z also prevented it from assessing retroactive interest and fees for periods in which no statements are sent.  *See* 12 C.F.R. § 1026.41(e)(6)(ii) (providing that interest and fees may be charged on a charged-off account once the sending of monthly statements is resumed, but fees or interest may not be retroactively assessed for the time during which statements were not sent).

14.    That said, SLS and now Shellpoint continued to send—and continue to send to this day—correspondence to Mr. Tuttle on behalf of the Trust claiming he owes the same retroactive interest and fees for periods in which no statements were sent, which have ballooned his approximately $54,000 initial balance to over $160,000.

15.    To avoid the exact circumstance Plaintiff now faces, TILA and Regulation Z require creditors and the servicers like SLS and Shellpoint who work on their behalf to send monthly statements to borrowers.  *See* 15 U.S.C. § 1638(f) ("The creditor, assignee,

4

or servicer with respect to any residential mortgage loan shall transmit to the obligor, for each billing cycle, a statement . . . ."); 12 C.F.R. § 1026.41(a)(2) (requiring periodic statements for closed-credit residential mortgage loans); *see also* 12 C.F.R. § 1026.41(e)(5) (requiring that monthly statements be sent to borrowers of closed-end credit loans discharged through bankruptcy except in specific circumstances); 12 C.F.R. § 1026.41(e)(6)(i) (providing that additional late fees or interest cannot be assessed on a charged-off account if statements are not sent); 12 C.F.R. § 1026.41(e)(6)(ii) (providing that interest and fees may be charged on a charged-off account once the sending of monthly statements is resumed, but fees or interest may not be retroactively assessed for the time during which statements were not sent).

16.    In fact, the CFPB has stated that times of default are "precisely when a consumer most needs the periodic statement" to "document fees and charges to the consumer."[3]  Simply put, "as long as such charges may be assessed, the consumer is entitled to receive a periodic statement."[4]

17.    The CFPB has also identified the same issue with servicers like Shellpoint and SLS assessing interest and fees on long-dormant mortgages for periods in which they failed to provide monthly statements to consumers:[5]

---

[3] 12 C.F.R. Part 1026 (CFPB Official Interpretations), https://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-tila.pdf (last visited Oct. 2, 2024).

[4] *Id.*
[5] Consumer Financial Protection Bureau, Advisory Opinion re: 12 C.F.R. Part 1006 (2023), https://files.consumerfinance.gov/f/documents/cfpb_regulation-f-time-barreddebtadvisory-opinion_2023-04.pdf.

5

Leading up to the 2008 financial crisis, many lenders originated mortgages to consumers without considering their ability to repay the loans. … One common piggyback mortgage product, known as an 80/20 loan, involved a first lien loan for 80 percent of the value of the home and a second lien loan for the remaining 20 percent of the valuation. … [In the event of default,] the second mortgage holder only receives proceeds from the foreclosure sale if there are any funds left after paying off the first mortgage. As a result, many second mortgage holders of piggyback loans, recognizing that a foreclosure would not generate enough money to cover even the first mortgage, charged their defaulted loans off as uncollectible and ceased communicating with the borrowers. … Many borrowers, having not received any notices or periodic statements for years, concluded that their second mortgages had been modified along with the first mortgage, discharged in bankruptcy, or forgiven. In recent years, as home prices have increased and borrowers have paid down their first mortgages, after years of silence, some borrowers are hearing from companies that claim to own or have the right to collect on their long-dormant second mortgages. These companies often demand the outstanding balance on the second mortgage, plus fees and interest, and threaten to foreclose if the borrower does not or cannot pay.

18.     Defendants' unfair practices also violate contract waiver principles, which prevent creditors and servicers from claiming amounts owed under a contract when they have failed to provide notice to the borrower of the accumulation of those amounts, especially, in this case, when they had over a decade to provide notice but failed to do so.

19.     Ignoring its obligations under TILA, Defendants failed to send monthly statements to Plaintiff and others who had their debt discharged during bankruptcy while retaining an interest in their property, yet it continued to assess interest and fees to their accounts, causing the balances to increase with no notice to consumers about the ballooning balance.

20.     And when consumers like Plaintiff disputed the inaccurate amount of their loan, Defendants have refused to correct their accounts.

6

21.     This conduct has significantly damaged the Plaintiff and countless other consumers, who have lost significant equity in their homes because of the illegal fees and charges that Shellpoint claims that they owe.

22.     As a result, Plaintiff brings class claims against Defendants for violations of the North Carolina Debt Collection Act, N.C.G.S. §§ 75-54 and 75-55, for attempting to collect and collecting illegal interest and fees from himself and other North Carolina consumers.

23.     Mr. Tuttle also brings individual claims against the Trust for breach of contract and against Shellpoint for violations of RESPA.

## **JURISDICTION AND VENUE**

24.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367. The Court also has jurisdiction under 28 U.S.C. § 1332, because there is complete diversity of citizenship between Plaintiff (a citizen of North Carolina) and Defendants (citizens of Delaware and South Carolina) and the amount in controversy exceeds $75,000, including the disputed interest and fees and other damages sought in this case. There is also jurisdiction under the Class Action Fairness Act, as there is complete diversity and the amount in controversy exceeds, in the aggregate, $5 million for the putative class members. Upon information and belief, there are thousands of putative class members, each with tens of thousands in disputed interest and fees that woud be cancelled or otherwise awarded in damages as part of this case.

25.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that establish this Complaint occurred in this District and Division, where Plaintiff resides.

## PARTIES

26.     Plaintiff Gregory Tuttle is a natural person residing in Yadkinville, North Carolina.

27.     Defendant Newrez, LLC d/b/a Shellpoint is a limited liability company organized under the laws of Delaware with its principal place of business in South Carolina. Shellpoint is the successor-in-interest to SLS by virtue of the acquisition of SLS by Shellpoint's parent company, Rithm Capital, and the merger of SLS with Shellpoint, effective May 1, 2024.

28.     Defendant Terwin Mortgage Trust 2005-3SL is a statutory trust organized under the laws of Delaware.

29.     Defendants are each a debt collector as defined by N.C.G.S. § 75-50(3) because they engaged in debt collection from a consumer: Mr. Tuttle and other natural persons in North Carolina who have incurred debt for personal, family, household, or agricultural purposes (mortgages on their personal residences).

## FACTS

### *Zombie Second Mortgages*

30.     This case arises from the recent wave of attempts to collect "zombie" second mortgages—largely, subprime second mortgages originated before the 2007–08 mortgage crisis.

31.     Before the mortgage crisis, second mortgages were often used in "80/20" mortgage schemes, which allowed underqualified borrowers to finance home purchases through two mortgages—without a down payment and without having to pay for mortgage insurance.

32.     But second mortgages severely harmed consumers because of high interest rates and large balloon payments due at the end of the loan.

33.     Many consumers during the Great Recession filed for bankruptcy, which eliminated their personal liability for paying their second mortgage. The lien on their home remained, however, meaning that if they did not continue paying their mortgage, the lender could foreclose on their home.

34.     In the years following the Great Recession, lenders were not required to send monthly statements to consumers who had received a bankruptcy discharge on their second mortgage.

35.     Without the monthly statements, many post-bankruptcy consumers did not understand that they had to continue paying their second mortgage to avoid foreclosure.

36.     Because the liens were still underwater after the bankruptcy, investors and servicers did not attempt to collect the outstanding loan balances through foreclosure. Instead, the loans stayed dormant and were sold—often several times—to various debt buyers and subprime lenders.

37.     Then, in April 2018, the CFPB changed Regulation Z to require loan servicers to send monthly mortgage statements to consumers who had discharged their mortgage in bankruptcy so long as they still retained an interest in the underlying property.

9

38.    Under the updated Regulation Z, a servicer can stop sending monthly statements if the consumer's mortgage loan is discharged through bankruptcy *and* at least one of the following occurs:

> (1) The consumer requests in writing that the servicer cease providing a periodic statement or coupon book;

> (2) The consumer's bankruptcy plan provides that the consumer will surrender the dwelling securing the mortgage loan, provides for the avoidance of the lien securing the mortgage loan, or otherwise does not provide for, as applicable, the payment of pre-bankruptcy arrearage or the maintenance of payments due under the mortgage loan;

> (3) A court enters an order in the bankruptcy case providing for the avoidance of the lien securing the mortgage loan, lifting the automatic stay pursuant to 11 U.S.C. 362 with regard to the dwelling securing the mortgage loan, or requiring the servicer to cease providing a periodic statement or coupon book; or

> (4) The consumer files with the court overseeing the bankruptcy case a statement of intention pursuant to 11 U.S.C. 521(a) identifying an intent to surrender the dwelling securing the mortgage loan and a consumer has not made any partial or periodic payment on the mortgage loan after the commencement of the consumer's bankruptcy case.

12 C.F.R. § 1026.41(e)(5)(i). If none of these exemptions apply, then the servicer must send monthly statements to post-bankruptcy consumers.

39.    Despite this updated regulation, many loan servicers, including SLS, did not start sending monthly mortgage statements to post-bankruptcy consumers—even though these statements would have alerted consumers to the fact that these mortgages still existed and were continuing to accumulate interest and other fees.

40.    This information, of course, would have allowed consumers to address their outstanding debt and prevent the loan balances from continuing to grow.

41. In fact, SLS acknowledged in correspondence sent to Plaintiff and others that, as of April 2018, it was required to send statements even for debts discharged through bankruptcy.

42. Yet SLS failed to update its internal policies and procedures after the regulations were changed to ensure that these statements were actually sent to borrowers, including Plaintiff.

43. And even though it was not sending the legally required monthly mortgage statements, SLS continued to assess interest charges and fees to the loans each month, causing the balances to balloon without giving consumers notice of the rapidly increasing balance.

44. In Plaintiff's case, for example, SLS and now Shellpoint have assessed tens of thousands in improper fees and charges to Plaintiff's loan, which they are now seeking to collect through the foreclosure of his home.

45. When companies like SLS and Shellpoint attempt to collect and actually collect these improper charges, including through foreclosure, they not only rob consumers of their homes, but they also strip them of tens of thousands of dollars in equity—one of the primary ways that low- and middle-income families build wealth.

### Plaintiff's Zombie Second Mortgage

46. In 1999, Plaintiff built and moved into his home in Yadkinville, North Carolina.

47. In 2005, Plaintiff decided to refinance his home.

48.     As with many borrowers at the time, Plaintiff used an 80/20 mortgage structure to refinance his home, with a primary mortgage to cover approximately 80 percent of the home's appraised value, and a second mortgage to cover the remaining 20 percent of the home's value.

49.     Plaintiff's second mortgage had an initial principal balance of approximately $54,000.

50.     SLS was the servicer of Plaintiff's second mortgage from at least March 2005 until in and around July 2024, when Shellpoint assumed servicing obligations for the loan following its merger with SLS.

51.     After Plaintiff fell on hard times, in 2006, he filed for Chapter 7 bankruptcy.

52.     Plaintiff stopped receiving monthly statements for his second mortgage in September 2006, the month he filed for bankruptcy.

53.     During the bankruptcy, Plaintiff filed a Statement of Intention indicating that he would retain his interest in his home and continue to pay the first and second mortgages under agreed-upon terms.

54.     As a result of the bankruptcy, in January 2007, Plaintiff's second mortgage was discharged.  At the time of discharge, his second mortgage had an outstanding principal balance of approximately $54,000.

55.     In December 2007, Plaintiff modified his first and second mortgages which reaffirmed the debt.  Eventually, with no statements regarding the second mortgage loan, Plaintiff defaulted on the loan and SLS confirmed that it also later charged off Plaintiff's second mortgage in April 2009.

56.     Following the bankruptcy discharge and charge-off, Plaintiff continued to not receive monthly statements and other correspondence regarding his second mortgage.

57.     Then, after nearly a decade of receiving no statements, in April 2018, Plaintiff received a letter from SLS titled "Monthly Statements" that stated, in relevant part, that due to "a recent change in loan servicing regulations" SLS was "require[d] . . . to now provide certain customers in bankruptcy or discharged from bankruptcy with monthly periodic statements via mail."

58.     The April 2018 letter informed Plaintiff that "[b]eginning in April [2018], Specialized Loan Servicing LLC (SLS) will be mailing new monthly statements to all of these customers, unless we are notified in writing that you do not wish to receive these statements moving forward."

59.     On the second page of the letter, SLS provided responses to frequently asked questions, including why Plaintiff had received the letter, which SLS explained was because he qualified under the regulation changes to "begin receiving a new monthly statement beginning in April 2018."

60.     Despite SLS's assurances that it would resume sending monthly statements to him, Plaintiff continued to receive no monthly statements from SLS regarding his second mortgage, including after April 2018.

61.     Meanwhile, he continued to make payments on his primary mortgage.

62.     After years of receiving no statements even after SLS told Plaintiff it was required to send him monthly statements if it intended to assess interest on his loan, Plaintiff started receiving statements claiming that he owed retroactive interest and fees on

13

his mortgage, which had added—at that time—approximately $20,000 to the balance of the loan.

63.     These statements continued to accrue interest and fees and claimed that Plaintiff owed retroactive interest for periods in which he had not received statements, even though federal regulations prohibited SLS from assessing these amounts.

64.     Then, in May 2023, SLS sent a Notice of Default to Plaintiff claiming that it intended to foreclose on his home if he did not pay the inflated balance.

65.     Ultimately, the Trust, as owner of the mortgage debt, filed for foreclosure in late 2023, sending correspondence to Mr. Tuttle that it would foreclose on his home for his failure to pay the inflated amounts.

66.     In response to Defendants' foreclosure threats and the inflated amounts it claimed he now owed, Plaintiff filed complaints with state and federal regulators and also sent a Qualified Written Request to SLS asking that it correct the unlawful interest assessed pursuant to federal and state law.

67.     Plaintiff's Qualified Written Request was sent to the address that SLS/Shellpoint had designated for these types of correspondence, and SLS/Shellpoint received it.

68.     Plaintiff's Qualified Written Request, which contained information sufficient to identify his loan, noted that the debts SLS sought to collect from him were improperly inflated under federal and state law and asked that it stop attempting to collect the unlawful amounts.

14

69.     In response to Plaintiff's complaints and his QWR, in December 2023, SLS provided a response claiming that it was entitled to enforce the lien on Plaintiff's property for the full amount of the debt it sought to collect.

70.     SLS—and now Shellpoint—has continued to send correspondence to Mr. Tuttle within the past year seeking to collect additional interest and fees on his second mortgage, even for periods during which no statements were sent, all under the ongoing threat of foreclosure.

71.     SLS's and now Shellpoint's conduct has caused considerable damages to Plaintiff, including the lost equity of approximately $20,000 for which Shellpoint retroactively assessed as interest, as well as the significant emotional distress of facing the loss of his family home if he does not pay amounts that he had no idea were purportedly accumulating during over a decade of hearing nothing about the alleged debt.

## COUNT ONE:
### Violation of N.C.G.S. § 75-55(2)
### (Class Claim Against the Trust)

72.     Plaintiff incorporates the preceding allegations.

73.     Under Federal Rule of Civil Procedure 23, Plaintiff brings this action for himself and on behalf of the following class:

> All consumers in North Carolina: (1) with a closed-end mortgage loan that was discharged through bankruptcy; (2) who did not otherwise qualify as exempt from receiving statements under 12 C.F.R. § 1026.41(e)(5)(i); (3) to whom the Trust or its agent sent correspondence in the four years predating the filing of this lawsuit; (4) seeking to collect late fees, default-related fees or interest for time periods when the consumer did not receive monthly statements.

74.     **Existence of a class.** Common questions of law and fact exist as to all

15

putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the Trust is a debt collector; (2) whether the Trust violated N.G.G.S. § 75-55(2) by collecting or attempting to collect interest or other charge, fee or expense incidental to the principal debt; and (3) the appropriate amount of damages and civil penalties.

75. **Adequacy of Representation.** Plaintiff is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the class members that he seeks to represent. Plaintiff has retained counsel competent and experienced in class-action litigation, and he intends to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiff nor his counsel have any interests that might cause them to not vigorously pursue this action.

76. **Numerosity.** On information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. On information and belief, the Trust owns thousands of non-performing loans and subjects all of them to the same procedures for the assessment of interest, default charges and late fees. The Trust's records (or the records of its agents) will also show whether or not monthly statements were sent to a class member. The class members' names and addresses are identifiable through the Trust's internal business records, and they may be notified of this litigation by published or mailed notice.

77. **Superiority.** Questions of law and fact common to the class members

16

predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by the Trust's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

78.    Through the multiple correspondences sent to Plaintiff and other North Carolina consumers within the last four years, the Trust violated N.C.G.S. § 75-55(2) by collecting or attempting to collect from Plaintiff and the putative class members interest or other charges, fees or expense incidental to the principal debt when not legally entitled to such fees or charges.

79.    For example, the Trust collected or attempted to collect from Plaintiff and the putative class members late fees and/or interest for the months that they were not sent monthly statements.

80.    The Trust's conduct was unconscionable. Plaintiff and the putative class members did not owe these late fees or interest because they were not sent monthly

17

statements for the periods for which the fees and interest were assessed.

81.    Plaintiff and each putative class member suffered an injury because of the Trust's conduct including, for example, an immediate loss of equity in their home upon the imposition of these charges, adverse impact on debt-making decisions, and emotional distress.

82.    Some class members also suffered damages when they paid these improper fees to the Trust.

83.    Under N.C.G.S. § 75-56, Plaintiff seeks actual damages, treble damages, and civil penalties of $500 - $4,000 for each violation for himself and each putative class member, and their reasonable attorneys' fees and costs. He also seeks actual and treble damages for the class members in the amount of the improper fees that they paid to the Trust.

## COUNT TWO:
### Violation of N.C.G.S. § 75-55(2)
### (Class Claim Against Shellpoint)

84.    Plaintiff incorporates the preceding allegations.

85.    Under North Carolina Rule of Civil Procedure 23, Plaintiff brings this action for himself and on behalf of the following class:

> All consumers in North Carolina: (1) with a closed-end mortgage serviced by SLS prior to Shellpoint's acquisition of the servicing rights to the loan; (2) with a discharged mortgage loan; (3) who did not otherwise qualify as exempt from receiving statements under 12 C.F.R. § 1026.41(e)(5)(i); (4) to whom Shellpoint or SLS sent correspondence in the four years predating the filing of this lawsuit; (3) seeking to collect late fees, default-related fees or interest assessed by Shellpoint or SLS for time periods when the consumer did not receive monthly statements.

18

86.     **Existence of a class.** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Shellpoint is a debt collector; (2) whether Shellpoint violated N.G.G.S. § 75-55(2) by collecting or attempting to collect interest or other charge, fee or expense incidental to the principal debt; and (3) the appropriate amount of damages and civil penalties.

87.     **Adequacy of Representation.** Plaintiff is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the class members that he seeks to represent. Plaintiff has retained counsel competent and experienced in class-action litigation, and he intends to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiff nor his counsel have any interests that might cause them to not vigorously pursue this action.

88.     **Numerosity.** On information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. On information and belief, Shellpoint owns thousands of non-performing loans previously serviced by SLS and subjects all of them to the same procedures for the assessment of interest, default charges and late fees. Shellpoint's records (or the records of its agents) will also show whether or not monthly statements were sent to a class member. The class members' names and addresses are identifiable through Shellpoint's internal business records, and they may be

19

notified of this litigation by published or mailed notice.

89. **<u>Superiority.</u>** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Shellpoint's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

90. Through the multiple correspondences sent to Plaintiff and other North Carolina consumers within the last four years, Shellpoint violated N.C.G.S. § 75-55(2) by collecting or attempting to collect from Plaintiff and the putative class members interest or other charges, fees or expense incidental to the principal debt when not legally entitled to such fees or charges.

91. For example, Shellpoint collected or attempted to collect from Plaintiff and the putative class members late fees and/or interest for the months that they were not sent monthly statements.

20

92.     Shellpoint's conduct was unconscionable. Plaintiff and the putative class members did not owe these late fees or interest because they were not sent monthly statements for the periods for which the fees and interest were assessed.

93.     Plaintiff and each putative class member suffered an injury because of Shellpoint's conduct including, for example, an immediate loss of equity in their home upon the imposition of these charges, adverse impact on debt-making decisions, and emotional distress.

94.     Some class members also suffered damages when they paid these improper fees to Shellpoint.

95.     Under N.C.G.S. § 75-56, Plaintiff seeks actual damages, treble damages, and civil penalties of $500 - $4,000 for each violation for himself and each putative class member, and their reasonable attorneys' fees and costs.  He also seeks actual and treble damages for the class members in the amount of the improper fees that they paid to Shellpoint.

**<u>COUNT THREE:</u>**
**Violation of N.C.G.S. § 75-54(4)**
**(Class Claim Against the Trust)**

96. Plaintiff incorporates the preceding allegations.

97.     Under North Carolina Rule of Civil Procedure 23, Plaintiff brings this action for himself and on behalf of the following class:

All consumers in North Carolina: (1) with a closed-end mortgage loan that was discharged through bankruptcy; (2) who did not otherwise qualify as exempt from receiving statements under 12 C.F.R. § 1026.41(e)(5)(i); (3) to whom the Trust or its agent sent correspondence in the four years predating the filing of this

21

lawsuit; (4) seeking to collect late fees, default-related fees or interest for time periods when the consumer did not receive monthly statements.

98.     **Existence of a class.** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the Trust is a debt collector; (2) whether the Trust violated N.G.G.S. § 75-55(2) by collecting or attempting to collect interest or other charge, fee or expense incidental to the principal debt; and (3) the appropriate amount of damages and civil penalties.

99.     **Adequacy of Representation.** Plaintiff is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the class members that he seeks to represent. Plaintiff has retained counsel competent and experienced in class-action litigation, and he intends to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiff nor his counsel have any interests that might cause them to not vigorously pursue this action.

100.     **Numerosity.** On information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. On information and belief, the Trust owns thousands of non-performing loans and subjects all of them to the same procedures for the assessment of interest, default charges and late fees.  The Trust's records (or the records of its agents) will also show whether or not monthly statements were sent to a class member. The class members' names and addresses are identifiable through the

Trust's internal business records, and they may be notified of this litigation by published or mailed notice.

101. **Superiority.** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by the Trust's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

102. Through multiple correspondences sent to Plaintiff and the putative class members, the Trust violated N.C.G.S. § 75-54(4) by falsely representing the character, extent, or amount of a debt.

103. For example, the Trust falsely represented that Plaintiff and the putative class members owed late fees and/or interest for the months that they were not sent monthly statements.

104.    The Trust's conduct was deceptive.  Plaintiff and the putative class members did not owe these late fees or interest because they were not sent monthly statements required by federal law.

105.    Plaintiff and each putative class member suffered an injury because of the Trust's conduct including, for example, an immediate loss of equity in their home upon the imposition of these charges, adverse impact on debt-making decisions, and emotional distress.

106.    Some class members also suffered damages when they paid these improper fees to the Trust.

107.    Under N.C.G.S. § 75-56, Plaintiff seeks actual damages, treble damages, and civil penalties of $500 - $4,000 for each violation for himself and each putative class member, and their reasonable attorneys' fees and costs.  He also seeks actual and treble damages for the class members in the amount of the improper fees that they paid to the Trust.

## COUNT FOUR:
### Violation of N.C.G.S. § 75-54(4)
### (Class Claim Against Shellpoint)

108.    Plaintiff incorporates the preceding allegations.

109.    Under Federal Rule of Civil Procedure 23, Plaintiff brings this claim on behalf of the same class as Count Two.

110.    **Existence of a class.** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the

putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Shellpoint is a debt collector; (2) whether Shellpoint violated N.C.G.S. § 75-54(4) by making false representations about Plaintiff's and putative class members' debts; and (3) the appropriate amount of damages and civil penalties.

111. **Adequacy of Representation.** Plaintiff is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the class members that he seeks to represent. Plaintiff has retained counsel competent and experienced in class-action litigation, and he intends to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiff nor his counsel have any interests that might cause them to not vigorously pursue this action.

112. **Numerosity.** On information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. On information and belief, Shellpoint owns thousands of non-performing loans previously serviced by SLS and subjects all of them to the same procedures for the assessment of interest, default charges and late fees. Shellpoint's records (or the records of its agents) will also show whether or not monthly statements were sent to a class member. The class members' names and addresses are identifiable through Shellpoint's internal business records, and they may be notified of this litigation by published or mailed notice.

113. **Superiority.** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is

superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Shellpoint's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

114. Through multiple correspondences sent to Plaintiff and the putative class members, Shellpoint violated N.C.G.S. § 75-54(4) by falsely representing the character, extent, or amount of a debt.

115. For example, Shellpoint falsely represented that Plaintiff and the putative class members owed late fees and/or interest for the months that they were not sent monthly statements.

116. Shellpoint's conduct was deceptive. Plaintiff and the putative class members did not owe these late fees or interest because they were not sent monthly statements required by federal law.

117. Plaintiff and each putative class member suffered an injury because of

26

Shellpoint's conduct including, for example, an immediate loss of equity in their home upon the imposition of these charges, adverse impact on debt-making decisions, and emotional distress.

118.    Some class members also suffered damages when they paid these improper fees to Shellpoint.

119.    Under N.C.G.S. § 75-56, Plaintiff seeks actual damages, treble damages, and civil penalties of $500 - $4,000 for each violation for himself and each putative class member, and their reasonable attorneys' fees and costs.  He also seeks actual and treble damages for the class members in the amount of the improper fees that they paid to Shellpoint.

## COUNT FIVE:
### Declaratory Judgment, 28 U.S.C. § 2201
### (Class Claim Against the Trust)

120.    Plaintiff incorporates the preceding allegations.

121.    Under Federal Rule of Civil Procedure 23, Plaintiff brings this action for himself and on behalf of the following class:

> All consumers nationwide who received a mortgage loan for a property (1) that was in default at the time the Trust purchased the loan; (2) against whom the Trust or its agents have collected or attempted to collect late fees, default-related fees or interest assessed by the Trust or its servicer for time periods when the consumer did not receive monthly statements.

122.    **Existence of a class.** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only

27

individual class members. The principal issues include: (1) whether Plaintiff and the putative class members are subject to ongoing harm absent a declaratory judgment; and (2) whether Plaintiff and the putative class members are entitled to a declaratory judgment that they do not owe retroactively-assessed interest and fees; and (3) the appropriate scope of the declaratory judgment.

123. **Adequacy of Representation.** Plaintiff is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the class members that he seeks to represent. Plaintiff has retained counsel competent and experienced in class-action litigation, and he intends to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiff nor his counsel have any interests that might cause them to not vigorously pursue this action.

124. **Numerosity.** On information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. On information and belief, the Trust owns thousands of non-performing loans and subjects all of them to the same procedures for the assessment of interest, default charges and late fees. The Trust's records (or the records of its agents) will also show whether or not monthly statements were sent to a class member. The class members' names and addresses are identifiable through the Trust's internal business records, and they may be notified of this litigation by published or mailed notice.

125. **Superiority.** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is

superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by the Trust's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

126.    Because Plaintiff and putative class members were the subject of collection efforts that included interest and fees that he and putative class members did not owe, the Trust is attempting to collect more money than is due under his and the putative class members' loans. Plaintiff and members of the class are subject to ongoing harm absent a declaration that interest and fees are waived and/or unenforceable, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

127.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the disputed interest and fees,

128.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy,

and a declaratory judgment is the appropriate mechanism for resolving the ongoing attempted imposition of the interest and fees.

129.     Accordingly, Plaintiff seeks a declaratory judgment that all interest and fees assessed for periods in which the Trust or its predecessors-in-interest failed to provide periodic statements are waived and/or unenforceable.

**COUNT SIX:**
**Breach of Contract**
**(Individual Claim Against the Trust)**

189.     Plaintiff incorporates the preceding allegations.

190.     A Deed of Trust is construed under North Carolina law as a contract.

191.     As a precondition to foreclosure under the terms of the Deed of Trust, the Trust was required to comply with applicable federal and state law and provide Plaintiff with a notice of default containing specific information about the default and how she could cure it.

192.     The Trust's default notices were defective because they listed an incorrect amount due on the loan. Specifically, they included interest and/or late fees that Plaintiff did not owe because he was not being sent monthly statements.

193.     A notice of default is a condition precedent to acceleration and foreclosure.

194.     The Trust breached the Deed of Trust and did not satisfy the preconditions to foreclosure because it did not act in good faith but acted with unclean hands by including interest and/or late fees that Plaintiff did not owe because he was not being sent monthly statements.

195.     The Trust's breach of Deed of Trust has caused Plaintiff to suffer actual

30

damages, including the assessment of fees and costs that he does not owe.

196.     Additionally, due to the Trust's own breach, Plaintiff's performance under the Deed of Trust is excused, and the Trust has waived the right to enforce the Deed of Trust through nonjudicial foreclosure when it has materially breached its contract, for over a decade, to Plaintiff's detriment.

197.     Plaintiff seeks an award of actual damages, including the restoration of lost equity, from the Trust for himself.

198.     Plaintiff also requests that the Court enjoin the Trust from enforcing the Deed of Trust, including the foreclosure sale of his home under the DCSA and N.C.G.S. § 45-21.34.

### COUNT SEVEN:
**Violation of N.C.G.S. § 75-51(6)**
**(Individual Claim Against Defendants)**

199.      Plaintiff incorporates the preceding allegations.

200.     The Defendants violated N.C.G.S. § 75-51(6) by representing that nonpayment of the debt may result in the sale of Plaintiff's home when such a sale is not permitted by law. Defendants did not have any present right to possession of the property when they conducted foreclosure activities, as Defendants did not comply with the Deed of Trust and applicable law.

201.     Instead, the Defendants claimed an inaccurate outstanding balance and an inflated amount to cure the default.

202.     Because of Defendants' violations of N.C.G.S. § 75-51(6), Plaintiff has suffered actual damages, including loss of equity and significant emotional distress.

31

203. Based on Defendants' violation of N.C.G.S. § 75-51(6), Plaintiff is entitled to actual damages, treble damages, and civil penalties of $500 - $4,000 for each violation, reasonable attorneys' fees and costs, and an order enjoining the sale of his home under the DCSA and N.C.G.S. § 45-21.34.

**COUNT EIGHT:**
**Unfair and Deceptive Trade Practices**
**(Individual Claim Against the Trust and Shellpoint)**

204. Plaintiff incorporates the preceding allegations.

205. The Trust's and Shellpoint's acts of buying and servicing mortgage loans, collecting and attempting to collect debts, and initiating and conducting foreclosure sales in this State constitute commerce in this State within the meaning of North Carolina's unfair and deceptive trade practice statutes.

206. In the course of the transactions, acts and omissions, in seeking payment of amounts exceeding $100,000 and conducting a foreclosure sale of Plaintiff's home without having sent him monthly mortgage statements, the Trust and Shellpoint violated TILA and the DCSA, as set forth above.

207. Their transactions, acts and omissions, in turn, violated North Carolina's unfair and deceptive trade practices statute, N.C. Gen. Stat. § 75-1.1 *et seq*.

208. As a result, Plaintiff has suffered actual damages, including significant loss of equity in his home, emotional distress caused by the fear of losing a home where he has lived for 20 years.

209. Plaintiff is entitled to actual damages, treble damages, reasonable attorneys' fees and costs, and an order enjoining the sale of his home under the DCSA and N.C.G.S.

32

§ 45-21.34.

### COUNT NINE:
**Violation of RESPA, 12 U.S.C. § 2605(e)(2); Reg. X, 12 C.F.R. § 1024.35(e)**
**(Individual Claim against Shellpoint)**

210.    Plaintiff incorporates the preceding allegations.

211.    Shellpoint violated 12 U.S.C. § 2605(e)(2) by failing to make appropriate corrections to Plaintiff's account in response to his Qualified Written Request, including removal of the improper interest and fees from his account assessed during the time that he was not receiving monthly statements.

212.    These charges were not permissible because the consumers were not receiving monthly mortgage statements, even though SLS was required to send them after the April 2018 amendments to Regulation Z.  SLS, therefore, should have removed the charges in response to Plaintiff's QWR.

213.    Shellpoint/SLS also did not conduct a reasonable investigation in response to the Plaintiff's QWR.

214.    Had a reasonable investigation occurred, Shellpoint/SLS would have discovered that no interest could lawfully accrue on the loans because SLS and Shellpoint had not sent periodic statements to Plaintiff since the April 2018 Regulation Z updates.

215.    Because of Shellpoint's conduct, Plaintiff suffered concrete injury in fact, lost equity, informational injury, and emotional distress, including aggravation and distress.

33

216. Upon information and belief, discovery will reveal that Shellpoint's noncompliance with 12 U.S.C. § 2605(e)(2) is part of a pattern or practice of noncompliance with this provision.

217. Shellpoint and its predecessor SLS have been sued multiple times for failing to properly respond to QWRs, including by failing to conduct a proper investigation or provide requested information.

218. In addition, the CFPB's consumer complaint portal shows that 8,017 mortgage-related complaints have been filed against SLS as of March 2025, including 144 complaints for failing to investigate an existing problem.

219. As of the same date, Shellpoint had 10,353 mortgage-related complaints filed with the CFPB, including 294 complaints for failing to investigate an existing problem.

220. Under 12 U.S.C. § 2605(f), Plaintiff seeks statutory damages, as well as his reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff respectfully requests his actual, statutory and exemplary damages; declaratory and injunctive relief; attorneys' fees and costs; pre- and post-judgment interest at the legal rate; and any other relief that the Court finds appropriate.

### PLAINTIFF DEMANDS A JURY TRIAL.

Dated: March 20, 2025.

_____/s/ Rashad Blossom_____
Rashad Blossom (State Bar No. 45621)
Blossom Law PLLC
301 S. McDowell St., Suite 1103
Charlotte, NC 28204

34

Telephone: (704) 256-7766
Facsimile: (704) 486-5952
rblossom@blossomlaw.com
*Local Rule 83.1(d) counsel for Plaintiff*

Kristi C. Kelly*
Casey S. Nash*
Matthew G. Rosendahl*
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: matt@kellyguzzo.com

*Attorneys for Plaintiff*

*\*Notice of Special Appearance forthcoming*